UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

\-------------------------------------------------------- X
                                                          :
MIDCAP BUSINESS CREDIT, LLC,                              :
                                                          :          **ORDER AND OPINION**
                                           Plaintiff,     :          **GRANTING MOTION TO**
                -against-                                 :          **DISMISS COMPLAINT**
                                                          :
MIDCAP FINANCIAL TRUST, MIDCAP                            :          21 Civ. 7922 (AKH)
FINANCIAL SERVICES, LLC, MIDCAP                           :
FINANCIAL SERVICES CAPITAL                                :
MANAGEMENT, LLC, MIDCAP FINCO                             :
DESIGNATED ACTIVITY COMPANY, and                          :
APOLLO CAPITAL MANAGEMENT, L.P.,                          :
                                                          :
                                           Defendants.    :
\-------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

      Plaintiff MidCap Business Credit, LLC ("Plaintiff") brings this suit against

MidCap Financial Trust, MidCap Financial Services, LLC, MidCap Financial Services Capital

Management, LLC, MidCap FinCo Designated Activity Company, and Apollo Capital

Management, L.P. (collectively "Defendants"), alleging violations of the Lanham Act, 15 U.S.C.

§ 101 *et seq*. ECF No. 1. Plaintiff owns a registered and incontestable mark in "MIDCAP

BUSINESS CREDIT," Reg. No. 4,797,903 (registered August 2015), and has applied for, but

not yet received, a registration for "MIDCAP" as a standalone mark.

      Plaintiff asserts two types of federal claims—one under 15 U.S.C. § 1114,

alleging infringement of Plaintiff's registered mark "MIDCAP FINANCIAL TRUST;" and the

second, under 15 U.S.C. § 1125(a), alleging unfair competition and false designation of origin

based on Plaintiff's rights in the unregistered mark "MIDCAP." Plaintiff asserts similar claims

under New York State law, N.Y. Gen. Bus. Law § 349, and under the common law.

1

Defendants move to dismiss the complaint for failure to state a claim under Rule 12(b)(6).  They argue that although Plaintiff purports to be enforcing its rights in "MIDCAP BUSINESS CREDIT," Plaintiff actually seeks to enforce rights in the standalone mark "MIDCAP," which it cannot do because "MIDCAP" is generic, or at best, descriptive of Plaintiff's services.  In essence, Defendants argue that Plaintiff cannot bootstrap a claim based upon its rights in "MIDCAP BUSINESS CREDIT" into a claim based upon the lesser included "MIDCAP."

I agree with Defendants.  The Complaint conflates "MIDCAP BUSINESS CREDIT" with "MIDCAP," and as to Plaintiff's rights in "MIDCAP," the Complaint is vague and conclusory.  For this reason, and others provided below, the motion to dismiss is granted.

## BACKGROUND

The Complaint alleges the facts as follow, which I accept as true for the purposes of deciding this motion.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff is a commercial finance company that works with and extends customized asset-based loans to small and mid-size manufacturers, distributors, wholesalers, service companies, and other commercial and industrial businesses throughout the United States. Compl. ¶ 1–2.[1]  It provides working capital loans to companies generally unable to obtain traditional bank financing sufficient to support their growth or unique needs.  ¶ 2.  Plaintiff began offering services under its current name, MidCap Business Credit, LLC, in 2004, officially changing its name from Hartford Business Credit, LLC, better to reflect its national customer base and expansion plans.  ¶ 3.  Since that time, Plaintiff has used the trade names, marks, domain names, and social media handles "MIDCAP," "MIDCAP CREDIT," and "MIDCAP

---

[1] Unless otherwise noted, all references to "¶" refer to allegations in the Complaint.

BUSINESS CREDIT," and variants thereof to identify its financial services, defined as "the 'MIDCAP MARKS.'"  ¶ 3.  At that time, Plaintiff operated the domain name midcapcredit.com and prominently displayed the following mark and logo:



¶ 3.  In 2013, Plaintiff described its primary site as midcap.com; it retained the midcapcredit.com domain name, and automatically redirected visitors to its site, midcap.com.  ¶¶ 4, 35.

In 2015, Plaintiff filed an application with the United States Patent and Trademark Office ("USPTO") to register "MIDCAP BUSINESS CREDIT" as a Class 36 Service Mark.  ¶ 44.  Plaintiff disclaimed use of the phrase "BUSINESS CREDIT;" however, the USPTO initially rejected Plaintiff's application, finding the "MIDCAP BUSINESS CREDIT" mark not registrable because "MIDCAP" was descriptive of at least one feature of Plaintiff's services.  *See* Ex. C, Declaration in Support of Motion, ECF No. 27-3.[2]  Plaintiff responded that regardless of whether "MIDCAP" was descriptive of its services, the mark had acquired secondary meaning and submitted supplemental proofs.  *See* Ex. D, Declaration in Support of Motion, ECF No. 27-4.  On August 25, 2015, relying on Plaintiff's proofs, the USPTO approved the application.  ¶ 54.  Plaintiff claims that "MIDCAP BUSINESS CREDIT" became incontestable in September 2021, after Plaintiff made Section 8 and 15 filings attesting continuous use of the registered mark.  ¶ 45.

---

[2] Because the Complaint references its registration, I find that the attending documents, available on the USPTO website, are incorporated by reference, or subject to judicial notice.  *See Telebrands Corp. v. Del Labs., Inc.*, 719 F. Supp. 2d 283, 287 n.3 (S.D.N.Y. 2010) ("The Court may properly take judicial notice of official records of the United States Patent and Trademark Office and the United States Copyright Office.") (citing *Island Software and Comput. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005)).

Prior to initiating this suit, on July 23, 2021, Plaintiff also filed an application to register the standalone mark "MIDCAP" as a Class 36 Service Mark.  ¶ 46.  The application remains pending.  ¶ 46.

Plaintiff alleges that it has developed and built goodwill in its mark.  Over the past 17 years, and across five regional North American origination offices, Plaintiff has consummated over 375 loan transactions totaling more than $800 million, and now has a dozen different affiliates whom it has "authorized" "to adopt business names incorporating the MIDCAP Marks to bring them under its MIDCAP brand.  ¶¶ 5, 36.

Plaintiff alleges that it engages in promotion and marketing activities.  It self-distributes press releases and "tombstone" advertisements to announce deals and other noteworthy items such as new hires; it sends them to industry publications and its mailing list, as well as posts them on social media and its own website.  ¶ 37.  By way of example, Plaintiff annexes to the Complaint copies of representative press releases and marketing materials that it released in 2005, 2006, and 2007, all bearing its logo and titled MidCap Business Credit, LLC NEWS.  *See* Ex. B, ECF No. 1-2.  The broker, investment banker, financial advisor, or consultant who refers a deal to Plaintiff also frequently promotes it and Plaintiff's involvement.  ¶ 37.  In addition, Plaintiff regularly receives media coverage in industry publications such as *The Asset Based Finance Journal*, *The Asset Based Lending Advisor*, and *The Secured Lender*.  Ex. C, ECF No. 1-3.

In addition, Plaintiff has participated in "virtually every annual national industry event, many interim national events, and nearly [sic] monthly regional events, sponsored by groups such as the Secured Finance Network and Turnaround Management Association."  ¶ 38.  Plaintiff's employees regularly present at industry conferences and contribute to or are quoted in

industry publications.  ¶ 38.  Plaintiff uses direct marketing and emphasizes its creativity, flexibility, customized debt solutions, and experienced team of seasoned professionals.  ¶ 39–40. Its primary sources of new business are professionals within commercial banks, investment banks, turn-around consulting firms, and in more recent years, private equity sponsors, and privately held wealth management companies, as well as attorneys and accountants.  ¶ 39. Plaintiff, its transactions, and team members have received numerous nominations and awards.  ¶ 41.  For example, in 2021, Plaintiff's received the Secured Finance National Achievement Award and was inducted into its Hall of Fame.  ¶ 41.

Defendant Midcap Financial Trust began operating in or about September 2008, under the trade name and mark "MIDCAP FINANCIAL" and utilizing the website midcapfinancial.com.  ¶¶ 8, 47.  At the time, it acted as a commercial lender specializing in providing debt solutions to health care companies, a heavily-regulated subspecialty in the finance industry which Plaintiff does not target.  ¶ 47.

Plaintiff was not aware of Defendants in 2008, but at some point between 2008 and August 2012, Plaintiff learned that Defendants were using MIDCAP and MIDCAP FINANCIAL to identify their lending services.  ¶¶ 47–48.  On August 15, 2012, Plaintiff's then-CEO Jeff Black called Defendant Midcap Financial Trust's then-CEO Howard Widra ("Widra") to discuss Plaintiff's concerns about possible confusion.  ¶ 48.  During that call, Widra stated that Midcap Financial had no plans or intention to extend beyond the healthcare industry, and also that his company was likely to be sold shortly, at which point, it would change its name and omit the term MIDCAP.  ¶ 49.

In or about November 2013, unbeknownst to Plaintiff, Defendant Apollo Global Management, LLC acquired Defendant Midcap Financial Trust.  ¶ 50.  At some later date,

Plaintiff learned of the acquisition but trusted that the new owner would rebrand as Widra had represented.  ¶ 50.  In or about August 2014, however, Plaintiff learned that Defendants planned to offer asset-based lending to companies of all types, and that Midcap Financial had not changed its name or branding.  ¶ 51.  Consequently, on or about September 19, 2014, Plaintiff sent Defendants a demand letter, objecting to Defendants' use of their marks and noting that confusion would likely ensue, if it had not begun already.  ¶ 52.  The parties then commenced settlement negotiations, aiming to resolve the conflict amicably and exploring a series of different structures to achieve that end.  ¶ 53.  It was during the course of these negotiations that Plaintiff filed and the USPTO approved, the above-described application to register "MIDCAP BUSINESS CREDIT."  ¶ 54.  The settlement negotiations have not succeeded.  ¶ 55.

***Infringing Conduct and Actual Confusion***

Plaintiff alleges that Defendants have not only coopted Plaintiff's MIDCAP Marks, but have also coopted Plaintiff's brand positioning in the marketplace.  ¶ 55.  As evidence, Plaintiff points to statements on Defendants' website, midcapfinancial.com, which tout Defendants as "a middle market-focused, specialty finance firm that provides senior debt solutions to companies across all industries" "created to address the unmet need for flexible and creative debt solutions to the middle market."  ¶ 55.

As a result of Defendants' use of its marks, Plaintiff alleges that confusion is not only likely but actual.  It offers the following "representative examples" of confusion:

> • In July 2012, Plaintiff received an email from a contact and referral source erroneously congratulating Plaintiff for winning an award that had actually been given to Defendants.  ¶ 60.

> • In June 2014, Plaintiff received an email from another referral source, congratulating Plaintiff on a recent hire, but it was Defendants, and not Plaintiff, who had made the hire.  ¶ 61.

• In September 2017, one of Plaintiff's senior vice presidents was selected as a "CFA 40 Under 40" award recipient, and the sponsor's original announcement featured Defendants' name and logo until belatedly corrected at Plaintiff's request.  ¶ 62.

• In September 2020, a new potential client sent Plaintiff a Non-Disclosure Agreement, but the signature line was for Midcap Financial, LLC.  ¶ 63.

• In April 2021, an online news outlet, *Law360*, published an article about one of Plaintiff's clients and erroneously identified Midcap Financial as its lender.  ¶ 64.

• In September 2021, big-four accounting firm KPMG prepared a pitch-book for one of Plaintiff's borrowers, and the pitch-book, intended to be circulated widely among a market of substantial importance to Plaintiff, incorrectly referred to Plaintiff as Midcap Financial.  ¶ 65.

• A search for "Midcap Financial" on the website abladvisor.com—which delivers "articles authored by subject matter experts, blogs presenting the views of industry leaders in numerous fields, industry/sector/economic data, industry deal tables, lender and service provider directory listings, and The Advisor Professional Network" and bills itself as a cutting-edge network built specifically to connect commercial finance professionals nationally— returns a mix of articles about Plaintiff and Defendant.  *Id.* ¶ 66.

Plaintiff maintains that Defendants' unauthorized use of "confusingly similar" marks is likely to cause confusion specifically with Plaintiff's federally registered mark "MIDCAP BUSINESS CREDIT" and also with Plaintiff's "MIDCAP Marks."  ¶¶ 76, 78.  Accordingly, Plaintiff brings suit for trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114; unfair competition and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); unfair competition and deceptive trade practices under New York State law, N.Y. Gen. Bus. Law § 349; and common law trademark infringement and unfair competition.  Defendants move to dismiss for failure to state a claim under Rule 12(b)(6).

## DISCUSSION

### I. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

        When considering a motion to dismiss, the Court must accept all of the

complaint's factual allegations as true and draw all reasonable inferences in the pleader's favor.

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993).  However, the Court is "not

bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at

678.  Additionally, while "a plaintiff may plead facts alleged upon information and belief 'where

the belief is based on factual information that makes the inference of culpability plausible,' such

allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'"

*Munoz-Nagel v. Guess, Inc.*, No. 12-1312, 2013 U.S. Dist. LEXIS 61710, at *3 (S.D.N.Y. Apr.

30, 2013) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) and *Prince v.*

*Madison Square Garden*, 427, F. Supp. 2d 372, 384 (S.D.N.Y. 2006).  The Court is limited to a

"narrow universe of materials."  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

"Generally, [courts] do not look beyond 'facts stated on the face of the complaint, . . . documents

appended to the complaint or incorporated in the complaint by reference, and . . . matters of

which judicial notice may be taken.'"  *Id.* (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*,

817 F.3d 46, 51 n.2 (2d Cir. 2016)) (alterations in original).

II.    Analysis

    A. Laches

        Defendants argue that Plaintiff's claims are barred by laches because Plaintiff had

knowledge of Defendants' use since as early as 2012 but no later than 2014, waited at most 9, or

at least 6, years to bring this suit, and that Defendants would suffer prejudice if Plaintiff's suit is allowed to proceed.  I disagree and hold that laches does not bar Plaintiff's claims.

The Second Circuit has long recognized the equitable defense of laches when a party alleges Lanham Act violations.  *See Conopco, Inc. v. Campell Soup, Co.*, 95 F.3d 187, 193 (2d Cir. 1996).  Laches is a "fundamental threshold matter" that must be resolved before reaching the merits of a plaintiff's trademark claims.  *See Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 216 (2d Cir. 2003), *abrogated on other grounds by 4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202 (2d Cir. 2019).  To prevail on a laches defense, a defendant must show that (1) the plaintiff knew that the defendant was using its mark; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant would suffer prejudice if the action were continued.  *See Beata Music LLC v. Danelli*, No. 18-CV-6354, 2022 U.S. Dist. LEXIS 2896, at *27 (citing *Cuban Cigar Brands N. V. v. Upmann Int'l, Inc.*, 457 F. Supp. 1090, 1096 (S.D.N.Y. 1978), *aff'd*, 607 F.2d 995 (2d Cir. 1979).  In the Second Circuit, "a presumption of laches applies in a trademark action if the plaintiff fails to bring suit within the six year statute of limitations applicable to state-law fraud in New York."  *Id.* (quoting *Harley Davidson, Inc. v. O'Connell*, 13 F. Supp. 2d 271, 279 (N.D.N.Y. 1998); *accord. George Nelson Found. v. Modernica, Inc.*, 12 F. Supp. 3d 635, 655 (S.D.N.Y. 2014).

Here, Plaintiff undoubtedly had notice of Defendants' use and delayed bringing suit for more than six years, raising a presumption of laches.  However, I find that laches does not apply because Plaintiff's delay in bringing suit was excusable.  Delay in filing suit for infringement will not count towards laches if during that time the parties were engaged in good faith settlement negotiations.  6 McCarthy on Trademarks and Unfair Competition § 31:15 (5th ed.); *Margaret Wendt Found. Holdings, Inc. v. Roycraft Assocs.*, No. 01-CV-74C, 2007 WL

3015224, at *8–9 (W.D.N.Y. Oct. 12, 2007).  Although the Complaint is sparse on the details of

settlement negotiations, it offers enough to rebut the presumption of laches.  Plaintiff alleges that

in 2012, Plaintiff's then-CEO had a telephone call with Defendants' then-CEO Howard Widra to

discuss concerns about the parties' concurrent uses of MIDCAP, and that at that time, Widra

represented that Defendants had no plans to expand their business beyond the healthcare

industry.  Further, Widra indicated that Defendant Midcap Financial would soon be acquired and

change its name, thereby obviating any concerns.  Then, notwithstanding the prior assurances, in

August 2014, Plaintiff learned that Defendants planned to expand its services to companies of all

types.  On September 19, 2014, Plaintiff sent Defendant Midcap Financial trust a cease-and-

desist letter, and although the Complaint offers no dates or specifics, it alleges that the parties

engaged in settlement negotiations, and that Plaintiff believed that both sides were negotiating in

good faith.  Crediting Plaintiff's allegations, as I must do, I find that Plaintiff's delay in suit was

excusable based upon settlement negotiations.  *See id.* at *8 (finding years of settlement

negotiations rebutted the presumption of laches).

    B. Failure to State a Claim

        1. Counts I, II, and IV

        Plaintiff brings claims under both Sections 32, 15 U.S.C. § 1114(a), and 43(a), 15

U.S.C. § 1125(a), of the Lanham Act, as well as under New York common law.  Section 1114(a)

principally differs from Section 1125(a) in that Section 1114(a) protects only registered marks,

whereas Section 1125(a) protects both registered and unregistered marks.  That said, all of

Plaintiff's claims—under the Lanham Act and common law—are analyzed using the same

framework.  *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206,

216 n.9 (2d Cir. 2012); *ESPN, Inc. v. Quiksilver, Inc.*, 586 F. Supp. 2d 219, 230 (S.D.N.Y. 2008)

(indicating that the elements to state a claim under New York law mirror those required to state a claim under the Lanham Act).  Because "[t]he essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another," Plaintiff's common-law unfair competition claim requires an additional showing of bad faith. *See OffWhite Prods., LLC v. Off-White LLC*, 480 F. Supp. 3d 558, 563 (S.D.N.Y. 2020) (quoting *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 50–51 (2d Cir. 2019)).

To assess these claims, courts apply a two-prong test: The first looks to whether the senior user's mark is entitled to protection, the second, to whether the junior user's use of its mark is likely to cause consumers confusion as to the origin or sponsorship of the goods.  *See Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016) (citing *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1993)).  Because "likelihood of confusion is a factual question, centering on the probable of reactions of prospective purchasers of the parties' goods," *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990), the question ordinarily is ill-suited for resolution on a motion to dismiss.  *See, e.g.*, *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 220 F.R.D. 39, 40 (S.D.N.Y. 2004).

Courts may appropriately dismiss claims on a motion to dismiss when plaintiffs cannot satisfy either of the two prongs.  "If the mark is not eligible for protection, there is no need to examine likelihood of confusion.  Such inquiry would, of course, be redundant, since a determination that a mark is ineligible for protection establishes that consumers do not associate that mark with a particular source." *Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 216 (2d Cir. 1985).  Alternatively, even if a mark is eligible for protection, "[c]laims . . . may be dismissed as a matter of law where the court is satisfied that the products or marks are so

dissimilar that no question of fact is presented." *Pirone*, 894 F.2d at 584 (quotation and citation omitted).

Plaintiff seeks to enforce rights in its: (i) registered "MIDCAP BUSINESS CREDIT" mark; (ii) unregistered MIDCAP mark; and (iii) MIDCAP Marks.  I address separately Plaintiff's claim based upon its registered and unregistered marks.

### 1. Registered Mark — "MIDCAP BUSINESS CREDIT"

"A registration with the USPTO is "prima facie evidence that the mark is registered and valid (i.e., protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Guthrie Healthcare Sys.*, 826 F.3d at 37 (citation omitted); *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 534–35 (2d Cir. 2005) ("[A] registered mark in continuous use for a five-year period is presumptively valid." (citing 15 U.S.C. § 1065)).  The sole question is whether Plaintiff has plausibly alleged a likelihood of consumer confusion.  I hold that it has not.

The likelihood-of-confusion prong turns on whether ordinary consumers "are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of [the junior user's] mark." *Id.* (citation omitted)).  "To support a finding of infringement, a probability of confusion, not a mere possibility, must exist." *Lopez v. Adidas Am., Inc.*, No. 19-CV-7631, 2020 U.S. Dist. LEXIS 88375 (S.D.N.Y. May, 19, 2020) (quoting *StreetWise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998)).  To assess the probability of confusion, courts rely on the non-exclusive multifactor test articulated in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961) ("the *Polaroid* factors") and consider:

> (1) the strength of Plaintiff's mark;
> (2) the similarity of the parties' marks;

(3) the proximity of the parties' areas of commerce;

(4) the likelihood that Plaintiff will bridge the gap separating their areas of activity;

(5) the existence of actual customer confusion;

(6) whether Defendant acted in bad faith or was otherwise reprehensible in adopting the mark;

(7) the quality of Defendants' product; and

(8) the sophistication of the relevant consumer group.

*See Guthrie Healthcare Sys.*, 826 F.3d at 37 (citing *Polaroid Corp.*, 287 F.2d at 495). "The application of the *Polaroid* test is 'not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused.'" *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (quoting *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 384 (2d Cir. 2005)). However, the Second Circuit has described "strength, similarity, and proximity . . . as the most important *Polaroid* factors in most cases." *Akiro LLC v.House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 342 (S.D.N.Y. 2013) (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987)). And as noted above, the Second Circuit has stated that, "in an appropriate case, the 'similarity of the marks' factor can be dispositive . . . ." *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000). Such dissimilarity may be found where, as here, the only similarity is a common word or phrase. *See Lopez*, U.S. 2020 Dist. LEXIS 88375, at *9.

Considering Plaintiff and Defendants' marks in their totality, I do not find them "as a whole . . . confusingly similar." *Advance Magazine Publishers, Inc. v. Norris*, 627 F. Supp. 2d 103, 117 (S.D.N.Y. 2008); *see also Giggle, Inc. v. netFocal Inc.*, 856 F. Supp. 2d 625, 635 (S.D.N.Y. 2012). To assess similarity, courts look to two key questions: (1) whether the similarity between the two is marks is likely to cause confusion and (2) what effect the similarity has upon prospective purchasers. *See Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955,

962 (2d Cir. 1996).  "Under the anti-dissection principle, the similarity analysis must assess the marks in their entirety without dissecting out any one component." *Giggle*, 856 F. Supp. 2d at 635 (citation omitted).  Courts do not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace. *Sports Auth., Inc.*, 89 F.3d at 962.  While words may be considered more heavily than design components of a mark, the words of a mark must be considered within the mark as a whole. *See New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 333–34 (S.D.N.Y. 2010).

While it is axiomatic that an infringer need not appropriate the entirety of a mark to be liable for infringement, *see, e.g.*, *McLean v. Fleming*, 96 U.S. 245, 253 (1877) ("[E]xact similitude is not required to constitute an infringement or to entitle the complaining party to protection."), it also is axiomatic that the presence of a single common element does not constitute infringement. *See, e.g.*, *Giggle*, 856 F. Supp. 2d at 635 (finding marks dissimilar where defendant's mark "only share[d] a single work—'giggle'—in common with any member of [plaintiff's] GIGGLE family of marks"); *Medici Classics Prods. LLC v. Medici Grp.* LLC, 590 F. Supp. 2d 548, 554 (S.D.N.Y. 2008) ("There is one obvious similarity between plaintiff's and defendants' marks in that they both employ the word 'Medici.'  However, this factor does not necessarily make the marks similar for purposes of assessing confusion under a Polaroid analysis.").  This is particularly so, when as here, the word (MIDCAP) is one of common meaning and has prevalent use in the relevant market (financial and lending services). *See Giggle*, 856 F. Supp. 2d at 635 (finding the similarity factor favored defendants where the one shared element—the word GIGGLE—was itself a weak mark due to extensive third party use in the relevant marketplace).

Here, the parties' marks share an obvious similarity—the word "MIDCAP."

14

However, this is where the similarities end.  The parties' marks as used differ both visually and textually.  First consider Plaintiff's mark:



On its website, Plaintiff presents a stylized logo consisting of a red square, and the word "MidCap" at the bottom of the square.  "MidCap" appears in a white serif font, further stylized through the capitalization of the "M" and "C."  Although its registered mark is "MIDCAP BUSINESS CREDIT," Plaintiff does not use the entirety of its mark, instead, abbreviating and referring to itself as "MidCap."

Now consider Defendants' mark:



Defendants' mark appears on a white background, with dark blue text and a dark blue and hunter green cross-shaped logo to the right.  Unlike Plaintiff, Defendants use the entirety of their trade name—Midcap Financial.  The text appears in two lines.  On top, an entirely lowercase "midcap" appears in a quasi-serif font; below it, an entirely uppercase "financial" appears in a sans serif font.  As noted above, Defendants further differentiate their branding by use of a cross-shaped logo that spans the height of the two lines of text.

Considering these two marks in series, I find it implausible that a consumer would find them similar, let alone confusingly similar.  Moreover, based upon the ubiquity of the word "MIDCAP" and its common parlance in the financial industry, I also find it implausible that this

similarity would have any impact on prospective purchasers.  Indeed, I doubt whether a

consumer, hearing or seeing the word "midcap" standing alone, would immediately associate it

with either Plaintiff or Defendants.  Plaintiff offers no facts suggesting otherwise, aside from its

own self-serving ipse dixit, that its consumers have come to associate it with the term "midcap,"

a conclusory allegation that I am not bound to accept.  *See Dow Jones & Co., Inc. v. Int'l Sec.*

*Exch., Inc.*, 451 F.3d 295, 307 (2d Cir. 2006) (indicating that "conclusory allegations

unsupported by factual assertions . . .  fail even the liberal standard of Rule 12(b)(6)") (cleaned

up).

My finding of substantial dissimilarity is supported amply by the case law.

Courts have found dissimilarity where marks actually share more similarities than are present

here.  Judge Koetl's analysis in *Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281 (S.D.N.Y.

2003), is particularly instructive.  There, both parties' magazines featured the letter "O"

prominently on their covers and in similar size and typeface, such that the magazines could each

be referred to as "O Magazine."  *Id.* at 296.  Notwithstanding those obvious similarities, Judge

Koetl found the marks not confusingly similar because of "plaintiff's use of guillemets and the

differences in cover layouts, photos and legends[, which] tend[ed] to differentiate the marks

when viewed in context."  *Id.*  In addition, he found the marks further distinguishable because

the reference in the defendant's magazine was a reference to Oprah Winfrey and her values,

while the plaintiff's mark did not refer to a personality and instead referenced lesbianism, fetish

culture, and sadomasochism.  *Id.*

As in *Brockmeyer*, while Plaintiff and Defendants' marks might lend to a

common abbreviation—*i.e.*, both parties could be referenced as MIDCAP—as the above images

and analysis illustrates, that lone similarity is overwhelmed by the differing typefaces, colorings,

and Defendants' use of its full name with an attendant logo.  *See also SLY Magazine, LLC v. Weider Publications L.L.C.*, 529 F. Supp. 2d 425, 439 (S.D.N.Y. 2007) (finding marks not confusingly similar even though both included the word SLY, where defendant's "SLY" always appeared in block capital letters, whereas plaintiff's always appeared in italicized script or followed by a tagline), *aff'd*, 346 Fed. App'x 721 (2d Cir. 2009) (summary order); *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 490–91 (S.D.N.Y. 2004) (finding "STRANGE MUSIC" and "sTRANGEmUSIC" marks created dissimilar "overall impressions" due to differences in "fonts, colors and emblems").  In addition, as in *Brockmeyer*, here Defendants employ "midcap" for its ordinary meaning[3] and with reference to their target customers—companies with a market capitalization between $2 and $5 million—whereas Plaintiff employs "midcap" to suggest that it works with small to mid-size companies but does not limit itself to "midcap" companies.

In sum, because the parties' uses of "MIDCAP" or "MIDCAP BUSINESS CREDIT" and "MIDCAP FINANCIAL" are so dissimilar in "font, colors, and arrangement," Defendants are entitled to judgment as a matter of law.  *See, e.g.*, *E.A. Sween Co., Inc. v. A & M Deli Express Inc.*, 787 Fed. App'x 780, 784 (2d Cir. 2019); *Nabisco*, 220 F.3d at 46–48 (finding use of "DENTYNE ICE" and "ICE BREAKERS" marks "so dissimilar as to require judgment

---

[3] Multiple dictionaries include definitions for the term "midcap."  *See, e.g.*, American Heritage dictionary ("Of or relating to corporations whose retained earnings and outstanding shares of common stock have a value between those of small cap companies and large cap corporations."); Investopedia ("The term that is used to designate companies with a market cap (capitalization)— or market value—between $2 and $10 billion"); Dictionary.com ("Designating a company, or a mutual fund that invests in companies, with a market capitalization of between $1 billion and $5 billion").

for [defendant]").  The motion is granted as to Plaintiff's asserted rights in its registered

"MIDCAP BUSINESS CREDIT" mark.

2. Unregistered Marks — "MIDCAP" and "the MIDCAP Marks"

Plaintiff has applied for, but the USPTO has not approved, a registration in the

standalone "MIDCAP."  Plaintiff also claims that it has established rights, through continuous

use, of its "MIDCAP Marks," which are all variations on a theme—the word "MIDCAP."  I hold

that Plaintiff fails plausibly to allege a valid and protectable mark in either "MIDCAP" or its

"MIDCAP Marks."

Whether and how much protection a mark is entitled to receive turns upon its

inherent distinctiveness and ability to identify the plaintiff as the source of the mark.  Courts

classify marks in one of four categories: "Arrayed in an ascending order which roughly reflects

their eligibility to trademark status and the degree of protection accorded, these classes are (1)

generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Abercrombie & Fitch Co.

v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976).  "Generic marks are those consisting of

words identifying the relevant category of goods or services.  They are not at all distinctive and

thus are not protectable under any circumstances." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d

373, 385 (2d Cir. 2005).  "Descriptive marks are those consisting of words identifying qualities

of the product.  They are not inherently distinctive, but are protectable provided they have

acquired secondary meaning, which we sometimes refer to as acquired distinctiveness." *Id.*

(internal quotation marks and citation omitted).  "Suggestive marks "merely suggest[] the

features of the product, requiring the purchaser to use imagination, thought, and perception to

reach a conclusion as to the nature of the goods." *Lane Capital Mgmt.*, 192 F.3d at 344.  Finally,

"[a]n arbitrary mark applies a common word in an unfamiliar way[, and] a fanciful mark is not a

real word at all, but is invented for its use as a mark." *Id.* Suggestive, arbitrary, and fanciful marks are each inherently distinctive, and presumptively entitled to protection. *Id.*

"MIDCAP" is, at worst, generic, or at best, descriptive, but not as Plaintiff's argue, suggestive. "The generic label attaches to words that comprise the ordinary language. It embraces terms which derive from nomenclature that has become the public domain and which are employed to identify a particular thing by its given name. Such terms cannot be appropriated or monopolized." *Big Star Entertainment, Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 195 (S.D.N.Y. 2000) (citing *American Cyanamid Corp. v. Connaught Lab., Inc.*, 800 F.2d 306 (2d Cir. 1986)). Descriptive marks rely on generic words that contain literal descriptions. These terms readily identify the qualities and signal the market in which the product may be found. *See, e.g.*, *Papercutter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558 (2d Cir. 1990) ("PAPER CUTTER" paper ornaments); *W.E. Bassett Co.*, 354 F.2d 868 ("TRIM" cuticle trimmer). These marks "incorporate[e] familiar words that manifestly refer to the goods or market, [and] piggyback[] on the product itself[.]" *Big Star*, 105 F. Supp. 2d at 196. A descriptive term "conveys an immediate idea of the ingredients, qualities, or characteristics of the goods." *See also Abercrombie & Fitch Co.*, 537 F.2d at 11 (quoting *Stix Products, Inc. v. United Merchants & Manufs., Inc.*, 295 Supp. 479, 488 (S.D.N.Y. 1968)). In contrast, suggestive marks may employ a generic term or ordinary language but require "imagination, thought, and perception to reach a conclusion as to the nature of the goods." *Id.* Courts have found marks suggestive when they demand or reflect "creativity; abstract thought and intuition; allegorical reference; metaphorical resemblance; figurative imagery; associational reasoning; and sheer incongruity . . . ." *Big Star Entertainment*, 105 F. Supp. 2d at 196–97 (offering examples such as "ROACH MOTEL" to refer to an insect trap and "COPPERTONE" to refer to suntan lotion).

"MIDCAP" is a generic word.  As the prevalence of dictionary definitions illustrates, *see supra* note 3, "MIDCAP" is a word in the public domain and certainly part of the everyday parlance of those who run in the financial services industry.   As a generic word, its "usage belongs to all who wish to speak" it.  *Id.*   "No single user may corner the market on application of particular terms of everyday speech to serve private purposes, to the exclusion of other persons who may seek, at the risk of potential liability to one who laid claim to words of common currency, to avail themselves of ordinary language to refer to an article by its publicly accepted name."  *Id.*  Indeed, Defendants use "midcap" in the generic sense, to succinctly and specifically describe their target market.  Plaintiff cannot preclude Defendants from using "MIDCAP" accurately, nor can it force Defendants to substitute a clunky alternative, such as "Two-to-Five-Million Market Capitalization Financial."  *See Big Star Entertainment*, 105 F. Supp. 2d at 195 ("Kentucky Fried Chicken could not usurp the words marking its product and thereby deprive 'Kansas Fried Chicken' of the use of common language to describe its own rand of the same thing, compelling the later entrant into strained construction of language for generic reference to the identical product, such as 'Kansas Fowl Cooked in Deep Fat.'"); *see also King Seeley Thermos Co. v. Aladdin Indus.*, 321 F.2d 577, 581 (2d Cir. 1963) (stating that "it would be unfair to unduly restrict the right of a competitor . . . to use [a] word [in the public domain").

Admittedly, Plaintiff does not use the word in the generic sense.  However, Plaintiff alleges that it offers asset-based lending services to small to mid-sized companies.  Thus, even if not generic, "MIDCAP" is at best descriptive because it refers at least to a portion of Plaintiff's services or "piggybacks" on its services.  Moreover, one need not employ more than a modicum of creativity or abstract thought to understand the nature of Plaintiff's services or who its target consumers are.  That "MIDCAP" is at best descriptive is buttressed by the

recent findings of the USPTO examiner who issued Plaintiff an action letter, citing as grounds for refusal or requirements, the potential that "MIDCAP" is descriptive. *See Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 543 (S.D.N.Y. 2012) (noting that although findings of the USPTO are not binding on district courts, they are given substantial deference in this Circuit).

Whether "MIDCAP" is generic or descriptive, however, is ultimately of no help to Plaintiff.  If generic, "MIDCAP" is ineligible for any protection; if it is descriptive, it is only eligible for protection if Plaintiff can plausibly allege that "MIDCAP" acquired secondary meaning prior to Defendants' allegedly infringing use. *See PaperCutter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558, 564 (2d Cir. 1990) ("An owner of a descriptive mark must demonstrate that the mark had acquired secondary meaning before its competitor commenced use of the mark."); *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir. 1980) ("Even if Saratoga Vichy has rights in the name 'Saratoga' because its use of the name has acquired a secondary meaning, it could not prevent the use of that term by one whose use had begun before the secondary meaning was acquired.").  I hold that Plaintiff fails plausibly to allege that "MIDCAP" acquired secondary meaning prior to Defendants' first use in 2008, or prior to their allegedly infringing use—some time between 2012 and 2014.

In determining whether a mark has acquired secondary meaning, courts look to a number of factors including: "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *Centaur Communs., Ltd. v. A/S/M Communs., Inc.* 830 F.2d 1217, 1227 (2d Cir. 1987) *overruled on other grounds Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1043 (2d Cir. 1992).

Plaintiff's evidence does not come close to plausibly alleging secondary meaning either prior to 2008 or 2012–2014.  Plaintiff has produced no consumer surveys, nor evidence of attempts at plagiarism.  As to advertising expenditures, Plaintiff alleges no specific dollar amounts but generally avers that it attends every industry event and releases tombstones and deal announcements.  As exhibits to the Complaint, Plaintiff attaches its own press releases dated between 2005 and 2007, as well as undated screenshots of its website, touting deals consummated.  While these may reflect Plaintiff's efforts to promote its marks, they speak nothing of consumers' awareness of the mark, or how the mark was perceived in the marketplace.

Plaintiff further conclusorily alleges that it receives unsolicited media coverage, naming various publications, attaching as evidence only one article, in which Plaintiff's officer was quoted, and Plaintiff's business described.  Plaintiff also touts that it has consummated 375 unique loan transactions totaling more than $800 million during its seventeen years in operation.  Unfortunately, Plaintiff provides no further allegations that link Plaintiff's efforts with consumers' perceptions.   Finally, Plaintiff alleges that its use was continuous and exclusive, save Defendants.  However, I find this allegation implausible given the ubiquity of the term in the industry itself.

In short, Plaintiff's evidence shows neither when, nor even if, consumers began to associate "MIDCAP" with Plaintiff or its services, let alone whether that association transpired prior to 2008 or 2012.  Consequently, even assuming that the "MIDCAP" mark is descriptive, it is ineligible for protection because Plaintiff fails to plausibly allege secondary meaning.  And, because its claim to rights in "the MIDCAP Marks" is predicated upon its claim to the term "MIDCAP," Plaintiff also cannot state a claim based upon those marks and variants thereof.

Accordingly, the motion is granted as to Plaintiff's asserted rights in "MIDCAP" and "the MIDCAP Marks."

### B. Count III

Defendants argue that Plaintiff fails to state a claim under N.Y. Gen. Bus. Law § 349 because it fails to allege specific and substantial injury to the public interest.  Although my findings and reasoning above would be sufficient to dismiss Plaintiff's Section 349 claim, I hold that even assuming Plaintiff had plausibly alleged trademark infringement under Counts I, II, or IV, Defendants still would be entitled to dismissal of Count III.

"[T]he prevailing view in the Second Circuit is that trademark . . . infringement claim[s] are not cognizable under [§ 349] unless there is specific and substantial injury to the public interest over and above the ordinary trademark infringement."  *Shandong Shinho Food Indus. Co. v. May Flower Int'l, Inc.*, 521 F. Supp. 3d 222, 263 (E.D.N.Y. 2021) (quoting *Perfect Pearl Co.*, 887 F. Supp. 2d at 543; *see also Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 352–53 (S.D.N.Y. 2014) (collecting cases holding that trademark infringement is outside the scope of Section 349).

Plaintiff acknowledges this precedent but directs my attention to *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, a case in which the New York Court of Appeals defined deceptive acts and practices in Section 349 as those "likely to mislead a reasonable consumer acting reasonably under the circumstances."  85 N.Y.2d 20, 26 (1995). Plaintiff argues that I need not reach the harder question of whether Defendants' conduct is "likely to mislead" because Plaintiff has alleged "widespread actual confusion."  Opp. at 25.

To further buttress its arguments, Plaintiff cites *GTFM, Inc. v. Solid Clothing, Inc.*, where the district court found a Section 349 claim cognizable based upon a single instance

of actual confusion.  *See* 215 F. Supp. 2d 273, 301–02 (S.D.N.Y. 2002).  Plaintiff's reliance is misplaced.  To begin, *GTFM* is at best persuasive authority.  However, that it was decided nearly twenty years ago, and before the above-cited precedent and authority, undercuts its persuasive value.  More importantly, the "one instance of actual confusion" cited in *GTFM* was substantially and materially different than anything Plaintiff offers here as "representative examples."

In *GTFM*, the district court found that the defendant was a serial trademark infringer, engaged in a longstanding practice of knocking-off trademarks.  *Id.* at 297.  The consumer was "a professional buyer of millions of dollars' worth of [the plaintiff's] apparel," and thus, "the quintessential sophisticated buyer."  *Id.* at 297.  Therefore, the court found that "[h]is confusion [spoke] volumes about the likely confusion of less informed consumers."  *Id.* at 297.  And further, as a result of the defendant's conduct, which was intended to cause, and did cause, "actual confusion," the plaintiff suffered injury in lost sales and the blurring of the distinctiveness of its mark.  *Id.* at 298.

This case is markedly different.  To begin, the majority of Plaintiff's "representative examples" do not, in fact, illustrate *consumer* confusion.  In fact, only one allegation portends *consumer* confusion—that a potential customer mistakenly named Plaintiff as MidCap Financial on the signature line of a non-disclosure agreement.  Plaintiff also does not allege any instances of lost sales resulting from the confusion, nor does its allegation about the clerical misattribution of the signature line plausibly suggest that it would suffer such an injury, given that in sending Plaintiff an NDA to be signed, the potential customer had expressed interest in doing business with Plaintiff.  Taken alone, this single instance of potential confusion does not speak volumes about consumers or potential confusion more broadly, nor does it mirror

the obviously harmful confusion that the *GTSM* court faced and recognized as cognizable under Section 349.

In short, Plaintiff's evidence of "actual confusion" is insufficient to support a finding that Defendants have engaged in anything more than (if any) garden variety trademark infringement.  Accordingly, the motion is granted as to Plaintiff's claims under Section 349.

## CONCLUSION

For the reasons provided above, Defendants' motion is granted in full.  The argument scheduled for March 9, 2022 is canceled.  The Clerk of the Court shall terminate ECF No. 28 and close the case.


SO ORDERED.

Dated:      March 8, 2022                          _____/s/ Alvin K. Hellerstein_____
            New York, New York                 ALVIN K. HELLERSTEIN
                                               United States District Judge