UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------- X
                                                         :
MIDCAP BUSINESS CREDIT, LLC,                             :
                                                         :
                                     Plaintiff,          :
                                                         :
              -against-                                  :
                                                         :
MIDCAP FINANCIAL TRUST, MIDCAP                           :
FINANCIAL SERVICES, LLC, MIDCAP                          :
FINANCIAL SERVICES CAPITAL                               :
MANAGEMENT, LLC, MIDCAP FINCO                            :
DESIGNATED ACTIVITY COMPANY, and                         :
APOLLO CAPITAL MANAGEMENT, L.P.,                         :
                                                         :
                                    Defendants.          :
------------------------------------------------------- X
```

**ORDER AND OPINION
GRANTING MOTION TO
DISMISS COMPLAINT**

21 Civ. 7922 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

In September 2021, Plaintiff MidCap Business Credit, LLC ("Plaintiff") brought this suit against MidCap Financial Trust, MidCap Financial Services, LLC, MidCap Financial Services Capital Management, LLC, MidCap FinCo Designated Activity Company, and Apollo Capital Management, L.P. (collectively "Defendants"). The Complaint asserted four claims: (1) trademark infringement of Plaintiff's registered mark "MIDCAP FINANCIAL TRUST" in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (Claim I); (2) unfair competition and false designation of origin based on Plaintiff's rights in the unregistered mark "MIDCAP" in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1) (Claim II); (3) unfair and deceptive trade practices in violation of N.Y. Gen. Bus. Law § 349 (Claim III); and (4) common law trademark infringement and unfair competition (Claim IV).

On December 3, 2021, Defendants moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6). ECF No. 26. I granted that motion on March 8, 2022. ECF No. 37. Plaintiff appealed my dismissal of Counts I, II, and IV. On November 23, 2022, the

Court of Appeals affirmed dismissal of Plaintiff's infringement claim based on the unregistered

MIDCAP mark.  ECF No. 41, at 7-8.  However, the Second Circuit vacated and remanded my

dismissal with respect to Plaintiff's registered mark "MIDCAP FINANCIAL TRUST" because

they could not "be confident that the District Court's likelihood-of-confusion analysis adequately

considered the *Polaroid* factors."  *Id.* at 7.  The Court of Appeal directed me to "engage in a

deliberate review of each [Polaroid] factor, and, if a factor is inapplicable to a case, [it should]

explain why."  *Id.* (citing *New Kayak Pool Corp. v. R&P Pools, Inc.*, 246 F.3d 183, 185 (2d Cir.

2001)).

   Applying the eight non-exclusive *Polaroid* factors as instructed by the Court of

Appeals, I once again find that the allegations of a likelihood of confusion are implausible.

Accordingly, Defendants' motion to dismiss is granted.

## BACKGROUND

   The Complaint alleges the facts as follow, which I accept as true for the purposes

of deciding this motion.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

   Plaintiff is a commercial finance company that works with and extends

customized asset-based loans to small and mid-size manufacturers, distributors, wholesalers,

service companies, and other commercial and industrial businesses throughout the United States.

Compl. ¶ 1–2.[1]  It provides working capital loans to companies generally unable to obtain

traditional bank financing sufficient to support their growth or unique needs.  ¶ 2.  Plaintiff began

offering services under its current name, MidCap Business Credit, LLC, in 2004, officially

changing its name from Hartford Business Credit, LLC, better to reflect its national customer

base and expansion plans.  ¶ 3.  Since that time, Plaintiff has used the trade names, marks,

---

[1] Unless otherwise noted, all references to "¶" refer to allegations in the Complaint.

domain names, and social media handles "MIDCAP," "MIDCAP CREDIT," and "MIDCAP

BUSINESS CREDIT," and variants thereof to identify its financial services, defined as "the

'MIDCAP MARKS.'" ¶ 3.  At that time, Plaintiff operated the domain name midcapcredit.com

and prominently displayed the following mark and logo:



¶ 3.  In 2013, Plaintiff described its primary site as midcap.com; it retained the midcapcredit.com

domain name, and automatically redirected visitors to its site, midcap.com.  ¶¶ 4, 35.

In 2015, Plaintiff filed an application with the United States Patent and

Trademark Office ("USPTO") to register "MIDCAP BUSINESS CREDIT" as a Class 36 Service

Mark.  ¶ 44.  Plaintiff disclaimed use of the phrase "BUSINESS CREDIT;" however, the

USPTO initially rejected Plaintiff's application, finding the "MIDCAP BUSINESS CREDIT"

mark not registrable because "MIDCAP" was descriptive of at least one feature of Plaintiff's

services.  *See* Ex. C, Declaration in Support of Motion, ECF No. 27-3.[2]  Plaintiff responded that

regardless of whether "MIDCAP" was descriptive of its services, the mark had acquired

secondary meaning and submitted supplemental proofs.  *See* Ex. D, Declaration in Support of

Motion, ECF No. 27-4.  On August 25, 2015, relying on Plaintiff's proofs, the USPTO approved

the application.  ¶ 54.  Plaintiff claims that "MIDCAP BUSINESS CREDIT" became

---

[2] Because the Complaint references its registration, I find that the attending documents, available on the USPTO website, are incorporated by reference, or subject to judicial notice.  *See Telebrands Corp. v. Del Labs., Inc.*, 719 F. Supp. 2d 283, 287 n.3 (S.D.N.Y. 2010) ("The Court may properly take judicial notice of official records of the United States Patent and Trademark Office and the United States Copyright Office.") (citing *Island Software and Comput. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005)).

incontestable in September 2021, after Plaintiff made Section 8 and 15 filings attesting continuous use of the registered mark.  ¶ 45.

Prior to initiating this suit, on July 23, 2021, Plaintiff also filed an application to register the standalone mark "MIDCAP" as a Class 36 Service Mark.  ¶ 46.  The application remains pending.  ¶ 46.

Plaintiff alleges that it has developed and built goodwill in its mark.  Over the past 17 years, and across five regional North American origination offices, Plaintiff has consummated over 375 loan transactions totaling more than $800 million, and now has a dozen different affiliates whom it has "authorized" "to adopt business names incorporating the MIDCAP Marks to bring them under its MIDCAP brand."  ¶¶ 5, 36.

Plaintiff alleges that it engages in promotion and marketing activities.  It self-distributes press releases and "tombstone" advertisements to announce deals and other noteworthy items such as new hires; it sends them to industry publications and its mailing list, as well as posts them on social media and its own website.  ¶ 37.  By way of example, Plaintiff annexes to the Complaint copies of representative press releases and marketing materials that it released in 2005, 2006, and 2007, all bearing its logo and titled MidCap Business Credit, LLC NEWS.  *See* Ex. B, ECF No. 1-2.  The broker, investment banker, financial advisor, or consultant who refers a deal to Plaintiff also frequently promotes it and Plaintiff's involvement.  ¶ 37.  In addition, Plaintiff regularly receives media coverage in industry publications such as *The Asset Based Finance Journal*, *The Asset Based Lending Advisor*, and *The Secured Lender*.  Ex. C, ECF No. 1-3.

In addition, Plaintiff has participated in "virtually every annual national industry event, many interim national events, and nearly [sic] monthly regional events, sponsored by

groups such as the Secured Finance Network and Turnaround Management Association." ¶ 38. Plaintiff's employees regularly present at industry conferences and contribute to or are quoted in industry publications. ¶ 38. Plaintiff uses direct marketing and emphasizes its creativity, flexibility, customized debt solutions, and experienced team of seasoned professionals. ¶ 39–40. Its primary sources of new business are professionals within commercial banks, investment banks, turn-around consulting firms, and in more recent years, private equity sponsors, and privately held wealth management companies, as well as attorneys and accountants. ¶ 39. Plaintiff, its transactions, and team members have received numerous nominations and awards. ¶ 41. For example, in 2021, Plaintiff's received the Secured Finance National Achievement Award and was inducted into its Hall of Fame. ¶ 41.

Defendant Midcap Financial Trust began operating in or about September 2008, under the trade name and mark "MIDCAP FINANCIAL" and utilizing the website midcapfinancial.com.  ¶¶ 8, 47. At the time, it acted as a commercial lender specializing in providing debt solutions to health care companies, a heavily-regulated subspecialty in the finance industry which Plaintiff does not target. ¶ 47.

Plaintiff was not aware of Defendants in 2008, but at some point between 2008 and August 2012, Plaintiff learned that Defendants were using MIDCAP and MIDCAP FINANCIAL to identify their lending services. ¶¶ 47–48. On August 15, 2012, Plaintiff's then-CEO Jeff Black called Defendant Midcap Financial Trust's then-CEO Howard Widra ("Widra") to discuss Plaintiff's concerns about possible confusion. ¶ 48. During that call, Widra stated that Midcap Financial had no plans or intention to extend beyond the healthcare industry, and also that his company was likely to be sold shortly, at which point, it would change its name and omit the term MIDCAP. ¶ 49.

In or about November 2013, unbeknownst to Plaintiff, Defendant Apollo Global Management, LLC acquired Defendant Midcap Financial Trust.  ¶ 50.  At some later date, Plaintiff learned of the acquisition but trusted that the new owner would rebrand as Widra had represented.  ¶ 50.  In or about August 2014, however, Plaintiff learned that Defendants planned to offer asset-based lending to companies of all types, and that Midcap Financial had not changed its name or branding.  ¶ 51.  Consequently, on or about September 19, 2014, Plaintiff sent Defendants a demand letter, objecting to Defendants' use of their marks and noting that confusion would likely ensue, if it had not begun already.  ¶ 52.  The parties then commenced settlement negotiations, aiming to resolve the conflict amicably and exploring a series of different structures to achieve that end.  ¶ 53.  It was during the course of these negotiations that Plaintiff filed and the USPTO approved, the above-described application to register "MIDCAP BUSINESS CREDIT."  ¶ 54.  The settlement negotiations have not succeeded.  ¶ 55.

***Infringing Conduct and Actual Confusion***

Plaintiff alleges that Defendants have not only coopted Plaintiff's MIDCAP Marks, but have also coopted Plaintiff's brand positioning in the marketplace.  ¶ 55.  As evidence, Plaintiff points to statements on Defendants' website, midcapfinancial.com, which tout Defendants as "a middle market-focused, specialty finance firm that provides senior debt solutions to companies across all industries" "created to address the unmet need for flexible and creative debt solutions to the middle market."  ¶ 55.

As a result of Defendants' use of its marks, Plaintiff alleges that confusion is not only likely but actual.  It offers the following "representative examples" of confusion:

> • In July 2012, Plaintiff received an email from a contact and referral source erroneously congratulating Plaintiff for winning an award that had actually been given to Defendants.  ¶ 60.

• In June 2014, Plaintiff received an email from another referral source, congratulating Plaintiff on a recent hire, but it was Defendants, and not Plaintiff, who had made the hire. ¶ 61.

• In September 2017, one of Plaintiff's senior vice presidents was selected as a "CFA 40 Under 40" award recipient, and the sponsor's original announcement featured Defendants' name and logo until belatedly corrected at Plaintiff's request. ¶ 62.

• In September 2020, a new potential client sent Plaintiff a Non-Disclosure Agreement, but the signature line was for Midcap Financial, LLC. ¶ 63.

• In April 2021, an online news outlet, *Law360*, published an article about one of Plaintiff's clients and erroneously identified Midcap Financial as its lender. ¶ 64.

• In September 2021, big-four accounting firm KPMG prepared a pitch-book for one of Plaintiff's borrowers, and the pitch-book, intended to be circulated widely among a market of substantial importance to Plaintiff, incorrectly referred to Plaintiff as Midcap Financial. ¶ 65.

• A search for "Midcap Financial" on the website abladvisor.com—which delivers "articles authored by subject matter experts, blogs presenting the views of industry leaders in numerous fields, industry/sector/economic data, industry deal tables, lender and service provider directory listings, and The Advisor Professional Network" and bills itself as a cutting-edge network built specifically to connect commercial finance professionals nationally— returns a mix of articles about Plaintiff and Defendant. *Id.* ¶ 66.

Plaintiff maintains that Defendants' unauthorized use of "confusingly similar" marks is likely to cause confusion specifically with Plaintiff's federally registered mark "MIDCAP BUSINESS CREDIT" and also with Plaintiff's "MIDCAP Marks." ¶¶ 76, 78.

Plaintiff filed suit, asserting four claims: (1) trademark infringement of Plaintiff's registered mark "MIDCAP FINANCIAL TRUST" in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (Claim I); (2) unfair competition and false designation of origin based on Plaintiff's rights in the unregistered mark "MIDCAP" in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1) (Claim II); (3) unfair and deceptive trade practices in violation of N.Y. Gen. Bus. Law § 349 (Claim III); and (4) common law trademark infringement

and unfair competition (Claim IV).  Defendant moved to dismiss, and I granted that motion on

March 8, 2022.  ECF No. 37.  Plaintiff appealed my dismissal of Counts I, II, and IV.  On

November 23, 2022, the Court of Appeals affirmed dismissal of Plaintiff's infringement claim

based on the unregistered MIDCAP mark.  ECF No. 41, at 7-8.  However, the Second Circuit

vacated and remanded my dismissal with respect to Plaintiff's registered mark "MIDCAP

FINANCIAL TRUST."  *Id.* at 7.  Thus, on remand, I reconsider only Plaintiff's trademark

infringement and unfair competition claims (Claims I and IV).

## DISCUSSION

I. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

When considering a motion to dismiss, the Court must accept all of the

complaint's factual allegations as true and draw all reasonable inferences in the pleader's favor.

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993).  However, the Court is "not

bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at

678.  Additionally, while "a plaintiff may plead facts alleged upon information and belief 'where

the belief is based on factual information that makes the inference of culpability plausible,' such

allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'"

*Munoz-Nagel v. Guess, Inc.*, No. 12-1312, 2013 U.S. Dist. LEXIS 61710, at *3 (S.D.N.Y. Apr.

30, 2013) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) and *Prince v.*

*Madison Square Garden*, 427, F. Supp. 2d 372, 384 (S.D.N.Y. 2006).  The Court is limited to a "narrow universe of materials."  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). "Generally, [courts] do not look beyond 'facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken.'"  *Id.* (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)) (alterations in original).

II.     Analysis

        A. Failure to State a Claim

        Plaintiff brings claims I and IV under Section 32, 15 U.S.C. § 1114(a) of the Lanham Act and New York common law, respectively.  Both claims are analyzed using the same framework.  *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206, 216 n.9 (2d Cir. 2012); *ESPN, Inc. v. Quiksilver, Inc.*, 586 F. Supp. 2d 219, 230 (S.D.N.Y. 2008) (indicating that the elements to state a claim under New York law mirror those required to state a claim under the Lanham Act).  Because "[t]he essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another," Plaintiff's common-law unfair competition claim requires an additional showing of bad faith. *See OffWhite Prods., LLC v. Off-White LLC*, 480 F. Supp. 3d 558, 563 (S.D.N.Y. 2020) (quoting *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 50–51 (2d Cir. 2019)).

        To assess these claims, courts apply a two-prong test: The first looks to whether the senior user's mark is entitled to protection, the second, to whether the junior user's use of its mark is likely to cause consumers confusion as to the origin or sponsorship of the goods.  *See Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016) (citing *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1993)).  Because "likelihood

of confusion is a factual question, centering on the probable of reactions of prospective purchasers of the parties' goods," *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990), the question ordinarily is ill-suited for resolution on a motion to dismiss. *See, e.g.*, *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 220 F.R.D. 39, 40 (S.D.N.Y. 2004).

Courts may appropriately dismiss claims on a motion to dismiss when plaintiffs cannot satisfy either of the two prongs. "If the mark is not eligible for protection, there is no need to examine likelihood of confusion. Such inquiry would, of course, be redundant, since a determination that a mark is ineligible for protection establishes that consumers do not associate that mark with a particular source." *Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 216 (2d Cir. 1985). Alternatively, even if a mark is eligible for protection, "[c]laims . . . may be dismissed as a matter of law where the court is satisfied that the products or marks are so dissimilar that no question of fact is presented." *Pirone*, 894 F.2d at 584 (quotation and citation omitted).

A registration with the USPTO is "prima facie evidence that the mark is registered and valid (i.e., protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Guthrie Healthcare Sys.*, 826 F.3d at 37 (citation omitted); *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 534–35 (2d Cir. 2005) ("[A] registered mark in continuous use for a five-year period is presumptively valid." (citing 15 U.S.C. § 1065)). Therefore, with regard to Plaintiff's registered mark in "MIDCAP BUSINESS CREDIT," the sole question is whether Plaintiff has plausibly alleged a likelihood of consumer confusion. I hold that it has not.

The likelihood-of-confusion prong turns on whether ordinary consumers "are likely to be misled or confused as to the source of the product in question because of the entrance

in the marketplace of [the junior user's] mark." *Id.* (citation omitted)).  "To support a finding of

infringement, a probability of confusion, not a mere possibility, must exist."  *Lopez v. Adidas*

*Am., Inc.*, No. 19-CV-7631, 2020 U.S. Dist. LEXIS 88375 (S.D.N.Y. May, 19, 2020) (quoting

*StreetWise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998)).  To assess the

probability of confusion, courts rely on the non-exclusive multifactor test articulated in *Polaroid*

*Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961) ("the *Polaroid* factors") and

consider:

> (1) the strength of Plaintiff's mark;
> (2) the similarity of the parties' marks;
> (3) the proximity of the parties' areas of commerce;
> (4) the likelihood that Plaintiff will bridge the gap separating their areas of
>     activity;
> (5) the existence of actual customer confusion;
> (6) whether Defendant acted in bad faith or was otherwise reprehensible in
>     adopting the mark;
> (7) the quality of Defendants' product; and
> (8) the sophistication of the relevant consumer group.

*See Guthrie Healthcare Sys.*, 826 F.3d at 37 (citing *Polaroid Corp.*, 287 F.2d at 495).  "The

application of the *Polaroid* test is 'not mechanical, but rather, focuses on the ultimate question of

whether, looking at the products in their totality, consumers are likely to be confused.'"

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (quoting *Star*

*Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 384 (2d Cir. 2005)).  However, the Second Circuit

has described "strength, similarity, and proximity . . . as the most important *Polaroid* factors in

most cases."  *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 342 (S.D.N.Y. 2013)

(citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987)).  I

consider each of the eight factors in turn.

> a.   Strength of Plaintiff's Mark

The strength of a mark "refers to its ability to identify the source of the goods being sold under its aegis." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 130 (2d Cir. 2004). "There are two components of a mark's strength: its inherent distinctiveness and the distinctiveness it has acquired in the marketplace." *Id.* at 130-31.

As a preliminary matter, "[w]hile an incontestable registered trademark enjoys a conclusive presumption of distinctiveness, incontestability does not relieve the trademark owner from the requirement of proving likelihood of confusion[.]" *Mr. Water Heater Enterprises, Inc. v. 1-800-Hot Water Heater, LLC*, 648 F. Supp. 2d 576, 584 (S.D.N.Y. 2009) (cleaned up). Indeed, the Second Circuit has on numerous occasions found that "the strength of an incontestable registered trademark could be overcome by the use of a descriptive or weak portion of the mark." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir. 1993) (collecting cases). Therefore, although Plaintiff's mark enjoys a presumption of distinctiveness due to its status as an incontestable registered trademark, I still consider the inherent and acquired distinctiveness of the mark in my evaluation of the mark's strength.

With regard to inherent distinctiveness, "courts classify a mark in one of four categories in increasing order of inherent distinctiveness: generic, descriptive, suggestive and arbitrary." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir.1998). I find that Plaintiff's mark is at best descriptive because it refers at least to a portion of Plaintiff's services. *See Gruner + Jahr*, 991 F.2d at 1076 (a descriptive mark is "one that tells something about a product, its qualities, ingredients or characteristics"). Moreover, one need not employ more than a modicum of creativity or abstract thought to understand the nature of Plaintiff's services or who its target consumers are. Because the mark is at best descriptive, it is "inherently weak" for the purposes of the *Polaroid* inquiry. *J.T. Colby & Co., Inc. v. Apple Inc.*, No. 11 Civ.

4060(DLC), 2013 WL1903883, at *15 (S.D.N.Y. May 8, 2013).

Turning to acquired distinctiveness, "[w]hen determining whether either a suggestive or descriptive mark is a strong one for purposes of the *Polaroid* inquiry, we look to the secondary meaning that the mark has acquired, because the ultimate issue to be decided is the mark's 'origin-indicating quality,' in the eyes of the purchasing public." *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 961 (2d Cir. 1996) (quotation marks omitted).  In determining whether a mark has acquired secondary meaning, courts look to a number of factors including: "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *Centaur Communs., Ltd. v. A/S/M Communs., Inc.*, 830 F.2d 1217, 1227 (2d Cir. 1987) *overruled on other grounds Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1043 (2d Cir. 1992).

My evaluation of the mark's secondary meaning echoes my analysis of the unregistered "MIDCAP" mark in my original order of dismissal.  *See* ECF No. 37, at 21-22.  I find that Plaintiff's evidence does not plausibly allege secondary meaning prior to 2008 or 2012–2014.  Plaintiff has produced no consumer surveys, nor evidence of attempts at plagiarism.  As to advertising expenditures, Plaintiff alleges no specific dollar amounts but generally avers that it attends every industry event and releases tombstones and deal announcements.  As exhibits to the Complaint, Plaintiff attaches its own press releases dated between 2005 and 2007, as well as undated screenshots of its website, touting deals consummated.  While these may reflect Plaintiff's efforts to promote its marks, they speak nothing of consumers' awareness of the mark, or how the mark was perceived in the marketplace.

Plaintiff further conclusorily alleges that it receives unsolicited media coverage, naming various publications, attaching as evidence only one article, in which Plaintiff's officer was quoted, and Plaintiff's business described.  Plaintiff also touts that it has consummated 375 unique loan transactions totaling more than $800 million during its seventeen years in operation. Unfortunately, Plaintiff provides no further allegations that link Plaintiff's efforts with consumers' perceptions.

For the foregoing reasons, I find that Plaintiff's mark is relatively weak despite its incontestable status.  *See Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 171 (5th Cir. 1986), *cert. denied*, 481 U.S. 1069 (1987) ("[i]ncontestable status does not make a weak mark strong"); *Mr. Water Heater*, 648 F. Supp. 2d at 586 ("While Plaintiffs rely on the incontestable status of the [mark], it is a relatively weak mark when examined against the likelihood of confusion in the relevant market.").  Accordingly, I find that this factor weighs in favor of Defendants.

b.  Similarity of the Parties' Marks

In evaluating this factor, the Court looks at the "the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers."  *Gruner + Jahr*, 991 F.2d at 1078. Dissimilarity may be found where, as here, the only similarity is a common word or phrase.  *See Lopez*, U.S. 2020 Dist. LEXIS 88375, at *9.

Considering Plaintiff and Defendants' marks in their totality, I do not find them "as a whole . . . confusingly similar."  *Advance Magazine Publishers, Inc. v. Norris*, 627 F. Supp. 2d 103, 117 (S.D.N.Y. 2008); *see also Giggle, Inc. v. netFocal Inc.*, 856 F. Supp. 2d 625, 635 (S.D.N.Y. 2012).  To assess similarity, courts look to two key questions: (1) whether the similarity between the two is marks is likely to cause confusion and (2) what effect the similarity

has upon prospective purchasers.  *See Sports Auth.*, 89 F.3d at 962.  "Under the anti-dissection principle, the similarity analysis must assess the marks in their entirety without dissecting out any one component."  *Giggle*, 856 F. Supp. 2d at 635 (citation omitted).  Courts do not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace.  *Sports Auth.*, 89 F.3d at 962.  While words may be considered more heavily than design components of a mark, the words of a mark must be considered within the mark as a whole.  *See New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 333–34 (S.D.N.Y. 2010).

While it is axiomatic that an infringer need not appropriate the entirety of a mark to be liable for infringement, *see, e.g.*, *McLean v. Fleming*, 96 U.S. 245, 253 (1877) ("[E]xact similitude is not required to constitute an infringement or to entitle the complaining party to protection."), it also is axiomatic that the presence of a single common element does not constitute infringement.  *See, e.g.*, *Giggle*, 856 F. Supp. 2d at 635 (finding marks dissimilar where defendant's mark "only share[d] a single word—'giggle'—in common with any member of [plaintiff's] GIGGLE family of marks"); *Medici Classics Prods. LLC v. Medici Grp.* LLC, 590 F. Supp. 2d 548, 554 (S.D.N.Y. 2008) ("There is one obvious similarity between plaintiff's and defendants' marks in that they both employ the word 'Medici.'  However, this factor does not necessarily make the marks similar for purposes of assessing confusion under a Polaroid analysis.").  This is particularly so, when as here, the word (MIDCAP) is one of common meaning and has prevalent use in the relevant market (financial and lending services).  *See Giggle*, 856 F. Supp. 2d at 635 (finding the similarity factor favored defendants where the one shared element—the word GIGGLE—was itself a weak mark due to extensive third party use in the relevant marketplace).

Here, the parties' marks share an obvious similarity—the word "MIDCAP." However, this is where the similarities end.  The parties' marks as used differ visually, textually, and aurally.  First consider Plaintiff's logo:



On its website, Plaintiff presents a stylized logo consisting of a red square, and the word "MidCap" at the bottom of the square.  "MidCap" appears in a white serif font, further stylized through the capitalization of the "M" and "C."  Although its registered mark is "MIDCAP BUSINESS CREDIT," Plaintiff does not use the entirety of its mark, instead, abbreviating and referring to itself as "MidCap."

Now consider Defendants' logo, which has been updated since my original order of dismissal:



Defendants' mark appears on a white background, with dark blue text and a dark blue and green x-shaped logo to the left.  Unlike Plaintiff, Defendants use the entirety of their trade name—Midcap Financial.  The text appears in two lines.  On top, "MidCap" appears in a sans serif font; below it, "Financial" appears in the same font.  Defendants further differentiate their branding by use of a cross-shaped emblem. In sum, the two logos are dissimilar in color, text, font, and graphics.

I take note of the Second Circuit's observation that, in considering this factor, my prior grant of dismissal "ignored . . . that the marks at issue are allegedly service marks that do not appear on product packaging and are meant to be heard as well as seen."  Putting aside the parties' logos and considering both the plain text and aural characteristics of the marks at issue, I find that "MIDCAP BUSINESS CREDIT" and "MIDCAP FINANCIAL" are not confusingly similar in plaint-text appearance or sound, despite sharing one word in common.  *See Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 515 F. Supp. 3d 47, 73 (S.D.N.Y. 2021) (finding that "Commute Time" and "TravelTime," were not confusingly similar in sound or appearance despite "[t]he fact that both marks feature the word 'time'").

Considering these two marks in series, and bearing in mind the Second Circuit's directive to consider this factor "in light of the way in which the marks are actually displayed in their purchasing context" (ECF No. 41, at 5-6 (citation omitted)), I once again find it implausible that a consumer would find the marks similar, let alone confusingly similar. Moreover, based upon the ubiquity of the word "midcap" and its common parlance in the financial industry, I also find it implausible that this similarity would have any impact on prospective purchasers.  Indeed, I doubt whether a consumer, hearing or seeing the word "midcap" standing alone, would immediately associate it with either Plaintiff or Defendants.  Plaintiff offers no facts suggesting otherwise, aside from its own self-serving ipse dixit, that its consumers have come to associate it with the term "midcap," a conclusory allegation that I am not bound to accept.  *See Dow Jones & Co., Inc. v. Int'l Sec. Exch., Inc.*, 451 F.3d 295, 307 (2d Cir. 2006) (indicating that "conclusory allegations unsupported by factual assertions . . .  fail even the liberal standard of Rule 12(b)(6)") (cleaned up).

My finding of substantial dissimilarity is supported amply by the case law.

17

Courts have found dissimilarity where marks actually share more similarities than are present here. Judge Koetl's analysis in *Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281 (S.D.N.Y. 2003), is particularly instructive. There, both parties' magazines featured the letter "O" prominently on their covers and in similar size and typeface, such that the magazines could each be referred to as "O Magazine." *Id.* at 296. Notwithstanding those obvious similarities, Judge Koetl found the marks not confusingly similar because of "plaintiff's use of guillemets and the differences in cover layouts, photos and legends[, which] tend[ed] to differentiate the marks when viewed in context." *Id.* In addition, he found the marks further distinguishable because the reference in the defendant's magazine was a reference to Oprah Winfrey and her values, while the plaintiff's mark did not refer to a personality and instead referenced lesbianism, fetish culture, and sadomasochism. *Id.*

As in *Brockmeyer*, while Plaintiff and Defendants' marks might lend to a common abbreviation—*i.e.*, both parties could be referenced as MIDCAP—as the above analysis illustrates, that lone similarity is overwhelmed by the differing typefaces, colorings, and Defendants' use of its full name with an attendant logo. *See SLY Magazine, LLC v. Weider Publications L.L.C.*, 529 F. Supp. 2d 425, 439 (S.D.N.Y. 2007) (finding marks not confusingly similar even though both included the word SLY, where defendant's "SLY" always appeared in block capital letters, whereas plaintiff's always appeared in italicized script or followed by a tagline), *aff'd*, 346 Fed. App'x 721 (2d Cir. 2009) (summary order); *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 490–91 (S.D.N.Y. 2004) (finding "STRANGE MUSIC" and "sTRANGEmUSIC" marks created dissimilar "overall impressions" due to differences in "fonts, colors and emblems"). In addition, as in *Brockmeyer*, here Defendants

employ "midcap" for its ordinary meaning[3] and with reference to their target customers—companies with a market capitalization between $2 and $5 million—whereas Plaintiff employs "midcap" to suggest that it works with small to mid-size companies but does not limit itself to "midcap" companies.

Accordingly, because the parties' uses of "MIDCAP BUSINESS CREDIT" and "MIDCAP FINANCIAL" are so dissimilar, I find that this factor weighs in favor of the Defendants.

c.   Proximity of the Parties' Areas of Commerce

The Complaint alleges, and the Defendants does not dispute, that the Defendants have started offering general commercial lending services in direct competition with Plaintiff. Compl. ¶ 55.  Therefore, this factor weighs in favor of the Plaintiff.

d.   Bridging the Gap

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005).  Because the parties are already in direct competition, "there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis in this case." *Id.*

e.   Existence of Actual Customer Confusion

---

[3] Multiple dictionaries include definitions for the term "midcap."  *See, e.g.*, American Heritage dictionary ("Of or relating to corporations whose retained earnings and outstanding shares of common stock have a value between those of small cap companies and large cap corporations."); Investopedia ("The term that is used to designate companies with a market cap (capitalization)—or market value—between $2 and $10 billion"); Dictionary.com ("Designating a company, or a mutual fund that invests in companies, with a market capitalization of between $1 billion and $5 billion").

"[T]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally." *Strange Music*, 326 F.Supp.2d at 494 (citing *Lang v. Ret. Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991). As discussed in my original order of dismissal, the majority of Plaintiff's "representative examples" of confusion do not, in fact, illustrate customer confusion. In fact, only one allegation portends consumer confusion—that a potential customer mistakenly named Plaintiff as MidCap Financial on the signature line of a non-disclosure agreement. Plaintiff also does not allege any instances of lost sales resulting from the confusion, nor does its allegation about the clerical misattribution of the signature line plausibly suggest that it would suffer such an injury, given that in sending Plaintiff an NDA to be signed, the potential customer had expressed interest in doing business with Plaintiff. Therefore, I find that there is insufficient evidence to demonstrate actual consumer confusion.

    f.   Whether Defendant Acted in Bad Faith

In evaluating this factor, the Court examines "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Sports Authority*, 89 F.3d at 964 (cleaned up). "Good faith can be found if a defendant has selected a mark which reflects the product's characteristics[.]" *Sports Auth.*, 89 F.3d at 964 (citation omitted). Although Plaintiff makes much of Defendants' expansion beyond the healthcare market, Plaintiff has offered no evidence that Defendants adopted their mark in the first instance with the intent to capitalize on Plaintiff's reputation and goodwill in the commercial lending industry. Additionally, "MIDCAP FINANCIAL" reflects the characteristics of Defendants' services, further supporting a finding of good faith. Accordingly, I find that this factor weighs in favor of Defendants.

    g.   Quality of Defendant's Product

In considering the quality of Defendants' product, "a very marked difference in quality between the two products would militate against finding a likelihood of confusion as consumers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user." *Star Indus.*, 412 F.3d at 389 (cleaned up).  Where, as here, Plaintiff "does not allege that [Defendants'] products are inferior, nor is there any evidence in the record substantiating the high or low quality of defendant's products relative to those of plaintiff . . . this factor is neutral as a matter of law."  *Malletier v. Dooney & Bourke, Inc.*, 561 F.Supp.2d 368, 389 (S.D.N.Y. 2008).

h.   Sophistication of the Relevant Consumer Group

Generally, "the more sophisticated the purchaser, the less likely he or she will be confused by the presence of similar marks in the marketplace."  *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 461 (2d Cir. 2004).  Where, as here, the parties have not submitted an expert opinions or surveys providing direct evidence of consumer sophistication, indirect evidence of sophistication may be derived from the record. *See Star Indus.*, 412 F.3d at 390.

The Complaint states that Plaintiff "works with small and mid-size manufacturers, distributors, wholesalers, service companies, and other commercial and industrial businesses[.]" Compl. ¶ 2. The Complaint additionally states that Plaintiff's new business primarily comes from "professionals within commercial banks, investment banks, turn-around consulting firms, and in more recent years, private equity sponsors, and privately held wealth management companies, as well as attorneys and accountants." *Id.* ¶ 39.  Meanwhile, the Complaint alleges that Defendants provide "asset-based loans to mid-sized companies" and "work[ ] with management teams and sponsors to deliver thoughtful and cost effective debt solutions." Id. ¶¶ 10, 55.

It is clear that both Plaintiff and Defendants offer their products and services to

sophisticated consumers unlikely to be confused by the similarities between the parties' marks.  I therefore find that this factor weighs in favor of Defendants.

> i.   Balancing the Factors

In sum, I find that two of the three most important *Polaroid* factors, strength and similarity, weigh in favor of Defendants, while proximity in the parties' areas of commerce weighs in favor of Plaintiff.  *See Akiro LLC v.House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 342 (S.D.N.Y. 2013).  The remaining factors are either irrelevant, neutral, or weigh in favor of Defendants.  On balance, I conclude that Plaintiff has not demonstrated that Defendants' use of "MIDCAP FINANCIAL" creates a likelihood of confusion among consumers. Accordingly, I find that Defendants are entitled to judgment as a matter of law.

## CONCLUSION

For the reasons provided above, Defendants' motion is granted.  The Clerk of the Court shall terminate ECF No. 28, and grant judgment to Defendants dismissing the case against them, with costs.


SO ORDERED.

Dated:      February 2, 2023
            New York, New York

                            /s/ Alvin K. Hellerstein
                            ALVIN K. HELLERSTEIN
                            United States District Judge